**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **DARRELL DEVORE** | : | |
| | : | |
| **Plaintiff,** | : | **Case No. 2:03-CV-215** |
| | : | |
| **v.** | : | **JUDGE ALGENON L. MARBLEY** |
| | : | |
| **ROLLS-ROYCE ENERGY** | : | **Magistrate Judge Abel** |
| **SYSTEMS, INC. et al.,** | : | |
| | : | |
| **Defendants.** | | |

## OPINION AND ORDER

### I.  INTRODUCTION

This matter came before the Court on two motions for summary judgment.  First,

Defendant Rolls-Royce Energy, Systems, Inc. ("Rolls-Royce" or the "Company") moves this

Court for summary judgment in its favor on all claims that Plaintiff has asserted against the

Company.  Second, Defendants International Association of Machinists and Aerospace Workers,

AFL-CIO ("IAM International"), Machinists District Lodge 28 ("DL 28"), and Machinists Local

Lodge 90 ("LL 90" and collectively, together with IAM International and DL 28, the "Union

Defendants" or the "Union") move this Court for summary judgment in their favor based on the

fact that the Union Defendants' actions did not constitute breach of their duty to represent

Plaintiff fairly.  For the reasons set forth below, Defendant Rolls-Royce's Motion is

**GRANTED**, and the Union Defendants' Motion is **GRANTED**.

## II.  BACKGROUND

### A.  Facts

<u>1.  The Undisputed Facts</u>

Plaintiff Darrell Devore ("Devore") was hired by Defendant Rolls-Royce on October 4, 1999.  Mr. Devore is a member of IAM International and LL 90.  Rolls-Royce is a designer and manufacturer of power turbines and compressors for the oil and gas industry.  IAM International is an international labor organization that represents employees in various industries, such as energy control systems, throughout the United States and Canada.  IAM International charters local lodges ("Local Lodges") throughout North America.  Individuals hold their membership in a Local Lodge, they elect their own Local Lodge officers, and they are governed by their own bylaws.  LL 90 is a Local Lodge.

IAM International also charters intermediate bodies known as district lodges ("District Lodges"), which are comprised of various Local Lodges that band together for purposes of collective bargaining in their geographic vicinity or industry.  DL 28 is a District Lodge.  At all relevant times, LL 90 was affiliated with DL 28.

Rolls-Royce and LL 90 negotiated a collective bargaining agreement ("CBA") effective March 29, 1999 to April 7, 2002.  As a member of LL 90, Plaintiff is subject to the CBA between Rolls-Royce and LL 90.  The CBA governs the adjustment of grievances through a grievance/arbitration process.  The grievance procedure generally involves four steps, culminating in final and binding arbitration before an impartial arbitrator.[1]

---

[1]Article XIV of the CBA governs the adjustment of grievances.  The first step requires a meeting between an aggrieved employee and the supervisor of the department involved.  The Union Steward participates if either party requests his presence.  If the parties do not reach an

## 2. Mr. Devore's Version of the Facts

Rolls-Royce employed Mr. Devore in one department for several years. In June 2001, Defendant Rolls-Royce transferred Plaintiff from Plant 2 to Plant 4. Rolls-Royce transferred Mr. Devore to the assembly floor, where he worked for approximately four months when a rumor began to circulate that someone was masturbating in Washroom No. 4.

Mr. Devore has a noticeable "tic" which causes him to display involuntary muscular movements which further cause his face to distort and his teeth to click repeatedly. Mr. Devore's "twitching" is due to a cervical spine pathology. He alleges that some Rolls-Royce employees have interpreted his "twitching" as evidence that he masturbates.

On November 14, 2001, Cheryl Schunke ("Schunke"), a Rolls-Royce employee who was assigned as a janitor to Plant 4 where her duties included cleaning the men's restroom, found a

_____

agreement within two workdays, the grievance must be reduced to writing, signed by the aggrieved party, and the parties proceed to the second step. The second step requires a meeting between an aggrieved employee, the department steward, the Union Chief Steward, if he desires to attend, the supervisor, and the superintendent. This meeting must be conducted within two workdays after Rolls-Royce receives an appealed grievance. Rolls-Royce must render a written answer to the grievance within two workdays after the second step meeting. The Union may appeal the grievance in writing to the third step within three workdays after receipt of Rolls-Royce's written answer. When possible, the Union should issue a brief statement of its reason(s) for rejecting Rolls-Royce's answer. The third step involves a meeting between the aggrieved employee and the Union Grievance Committee, which includes the Manager of Industrial Relations of the plant, and other management representatives. The third step meeting must be held within five workdays after Rolls-Royce receives the Union's written appeal. Rolls-Royce must issue an answer in writing within three workdays following the meeting. The Union may appeal the grievance to the fourth step within fifteen workdays after it receives Rolls-Royce's answer. If the Union appeals the grievance, it must issue a letter in which it demands arbitration and states its reasons for rejecting Rolls-Royce's answer. If the parties have failed to settle the grievance in the first three steps, either party has the right to submit the matter to an impartial arbitrator. The parties are required to meet within five days after notice to arbitrate is given so that they may agree upon the selection of an arbitrator. The CBA provides for a mechanism through which an arbitrator is selected if the parties cannot agree upon one.

substance in the men's restroom that she believed to be human semen.  She reported her findings to her LL 90 Union representative, Jeff Melton ("Melton"), who reported this information to Patrick McLarnan ("McLarnan"), Rolls-Royce's Director of Labor Relations.  Mr. McLarnan authorized a sign to be placed in the men's restroom in response to complaints regarding alleged masturbation practices.  Ms. Schunke also contacted Deana Latham ("Latham"), Rolls-Royce's Manager of Human Resources.  Ms. Schunke, or another individual contacted Rolls-Royce's parent corporation through the Equity Hot Line regarding alleged masturbation practices in the men's restroom of Plant 4.  Nick Brookes ("Brookes"), Rolls-Royce's President of Oil and Gas and Ethics Director received word of the ethics complaint.  Mr. Brookes asked Ms. Latham to investigate the ethics complaint.

On November 24, 2001, Ms. Latham attended a meeting with Paul Hays ("Hays"), the LL 90 Chief Steward, Jim Drake ("Drake"), the LL 90 President, and Mr. McLarnan.  Mr. Devore was not present at this meeting.  During the meeting, Mr. McLarnan asked the Union to approach Mr. Devore to inform him that he had been implicated in the alleged masturbation activities in the men's restroom.  The Union declined to speak with Mr. Devore concerning the masturbation allegations.

On November 29, 2001, Mr. Hays and Mr. Drake accompanied Mr. Devore to Ms. Latham's office, where Mr. Devore learned for the first time that he was being investigated in connection with the alleged masturbation activities in the men's restroom.  Neither Mr. Hays nor Mr. Drake had informed Mr. Devore that he was specifically designated as the perpetrator in the alleged masturbation activities.  At this meeting, Mr. Devore was not charged with any inappropriate sexual behavior.  Instead, the meeting attendees discussed the issue of

masturbation in general terms. Subsequently, on December 4, 2001, Mr. Hays and Mr. Drake accompanied Mr. Devore to Ms. Latham's office where Mr. Devore was formally charged with engaging in masturbation in the Plant 4 men's restroom and he received a three and one-half day suspension from work. Mr. Devore also contends that because of Rolls-Royce employee accusations of sexual impropriety, he has been labeled as a "sexual deviant," which may negatively impact his career at the Company. Mr. Devore specifically identified John Knipp ("Knipp"), a Rolls-Royce employee, as someone who claimed to have heard him masturbating in the men's restroom.

Finally, Mr. Devore claims that he had requested that his attorney, Howard Mishler ("Mishler"), be allowed to attend the arbitration only to observe the proceeding, not to represent him. According to Mr. Devore, the Union denied his request. James C. Duff ("Arbitrator Duff") rendered a decision adverse to Mr. Devore. Mr. Devore asked DL 28 to appeal the arbitrator's decision, but Benjamin M. Rayburn, Directing Business Representative for DL 28 ("DBR Rayburn"), refused to appeal the arbitrator's decision.

### 3. IAM International, LL 90, and DL 28's Version of the Facts

In late November 2001, Mr. Devore, Mr. Hays, and Mr. Drake attended a meeting with Ms. Latham and Mr. McLarnan. Ms. Latham notified those present at the meeting that she was conducting an investigation in light of an ethics hot-line complaint regarding inappropriate behavior in the men's restroom of Plant 4. Some fellow coworkers had accused Mr. Devore of masturbating in the men's restroom, which he denied. On December 4, 2001, Mr. Devore attended another meeting along with Mr. Hays, Mr. Drake, Ms. Latham, and Mr. McLarnan. At this meeting, Rolls-Royce representatives informed Mr. Devore that their investigation identified

him as the individual involved in the reported restroom misconduct and that he would be disciplined for engaging in inappropriate behavior (masturbation) in the men's restroom.  Mr. Hays and Mr. Drake dissented on behalf of Mr. Devore.  Specifically, Mr. Drake queried how the employees who reported misconduct knew that the behavior was in fact masturbation.  Mr. Hays asked the Company who identified the alleged semen and whether management had retained the evidence.  Nevertheless, Rolls-Royce suspended Mr. Devore for three days.

The Union immediately filed a grievance under the terms of the CBA on Mr. Devore's behalf.  A second step meeting was held on January 7, 2002.  At this meeting, the Union representatives again challenged the Company's evidence, particularly the lack of proof concerning the substance that Ms. Schunke allegedly found in the men's restroom.  The Union representatives also pointed out that the Company had failed to connect the alleged substance to Mr. Devore.  Rolls-Royce persisted in its position.  On that same day, Rolls-Royce answered the second step, denying the grievance.  The Union sought a third step meeting.

Between December 4, 2001, and March 1, 2002, Mr. Hays spoke with Mr. Devore numerous times regarding his case.  Mr. Hays advised Mr. Devore that the grievance could be settled on the basis of three days of back pay and that his record could be cleared several months in the future.  Mr. Devore, however, was dissatisfied with Mr. Hays' proposal.

Prior to the third step meeting, Mr. Hays turned over his materials to DBR Rayburn.[2] DBR Rayburn spoke directly with Mr. Devore many times about his case.  At the third step meeting, DBR Rayburn maintained Plaintiff's innocence, and while he offered to work out a

_____

[2]It is customary in the IAM for District Lodges to assist their affiliated Local Lodges with grievance arbitrations.  (Union Defs.' Mem. Supp. Summ. J. at 4 n.1).

settlement, DBR Rayburn also indicated that the Union was prepared to proceed to arbitration. Later in March 2002, Defendant Rolls-Royce denied the grievance and the Local Lodge Grievance Committee voted unanimously to arbitrate Plaintiff's case.

DBR Rayburn and Defendant Rolls-Royce chose Arbitrator Duff to serve as arbitrator over Plaintiff's grievance. DBR Rayburn selected Arbitrator Duff based on his previous favorable experience with the arbitrator.

In the summer of 2002, DBR Rayburn began preparing for the arbitration. He had a pre-arbitration meeting with Mr. Devore and various LL 90 representatives, including Mr. Hays and Mr. Drake. DBR Rayburn reviewed the LL 90 file, and spoke to the grievant and the employee representatives. Mr. Hays and Mr. Drake informed DBR Rayburn of the general course of events, as well as specific complaints of fellow coworkers about Mr. Devore's alleged behavior. No one, not Mr. Drake, Mr. Hays, nor Mr. Devore informed DBR Rayburn that Rolls-Royce suspected anyone other than Mr. Devore as the one engaging in masturbation in the men's restroom. DBR Rayburn personally interviewed the three employees who had made complaints regarding Mr. Devore's alleged behavior and the janitor who found the substance in the men's restroom. DBR Rayburn's investigation did not reveal any eyewitnesses to Mr. Devore's alleged conduct.

Before the arbitration, DBR Rayburn met with his three witnesses, Mr. Hays, Tom Underwood, and Mr. Devore to review their testimony. He outlined his theory of the case and prepared for cross-examination. Mr. Devore did not indicate any disagreement with DBR Rayburn's approach. DBR Rayburn prepared for arbitration just as he had done with many other cases that he had presented during his career. If anything was different, it was the fact that DBR

Rayburn spoke to Mr. Devore more than any other grievant that he had ever represented.

Just prior to the arbitration, Mr. Devore told DBR Rayburn that he wanted his personal attorney, Mr. Mishler, to represent him in the arbitration or to be present as a witness and assistant.  According to the Union Defendants, it is not the practice of the IAM to utilize attorneys in typical labor arbitrations.  DBR Rayburn denied Mr. Devore's request based on the Union's practice and because the CBA did not permit outside parties to be present.  Additionally, DBR Rayburn took the view that the case did not involve any novel or complex legal or factual issues that would have necessitated outside assistance.  DBR Rayburn was familiar with the CBA, which he had personally negotiated and administered over many years, he believed that he had conducted a complete and thorough investigation, and that he was fully prepared to present the case.

On September 17, 2002, Arbitrator Duff conducted the arbitration.  DBR Rayburn presented the Union's case, and Chief Steward Hays assisted him.  For the first time Mr. Devore expressed his reluctance to testify on his own behalf.  DBR Rayburn persuaded him to testify because Mr. Devore had vehemently denied the allegations made by the three coworkers who claimed that they "witnessed" Mr. Devore in the restroom, and DBR Rayburn believed that Mr. Devore's own testimony was critical to his case.  There was no transcript of the proceeding, but this is not uncommon.  DBR Rayburn submitted a post-hearing brief in which he emphasized the Company's flimsy case and lack of concrete evidence.

Mr. Devore asked LL 90 to appeal the adverse arbitration decision.  When the LL 90 refused, he sought leave for his personal counsel to appeal the arbitrator's decision on behalf of the local lodge.  The Union rejected Mr. Devore's request because the CBA provides that the

decision of the arbitrator is final and binding and Mr. Devore was unable to point to any arbitrator misconduct, fraud, or newly discovered evidence to justify an appeal.

### 4. Rolls-Royce's Version of the Facts

In October 2001, Mr. Knipp was in the first stall of the men's restroom on the first floor of Plant 4 when he heard noises coming from an adjacent stall. He determined that the noises sounded like a person masturbating. Before Mr. Knipp left the restroom, he confirmed that there was no one else in the restroom stalls besides himself and the person in the adjacent stall. Mr. Knipp walked to the urinal side of the restroom where he saw a coworker, Al Hurt ("Hurt"). Mr. Knipp left the restroom and waited in the hallway immediately outside the only entrance to the restroom where he could view anyone who entered or exited. He saw Mr. Hurt exit the restroom and then, approximately five minutes later, he saw Mr. Devore exit–no one else left the restroom. After Mr. Devore exited the restroom, Mr. Knipp reentered the restroom and confirmed that no one else was there.

Also, in October 2001, Ms. Schunke had heard rumors that an employee was "jacking off" in the restroom. Ms. Schunke's Union Steward, Mr. Melton informed her that an employee was "relieving himself" in the men's restroom and that for her own safety, she should be careful when present in the men's restroom, and she should wear protective gloves. In early November 2001, Mr. McLarnan posted a sign in the men's restroom in response to complaints that someone was masturbating in there. On November 14, 2001, when Ms. Schunke saw the sign, she contacted Ms. Latham. The following day, Mr. Drake and Mr. McLarnan approached Ms. Latham regarding the allegations of masturbation. Ms. Latham requested that the Union handle the matter informally. Ms. Latham believed that the Union knew the identity of the person who

was involved.  Mr. Drake said that he would consider the request.

On November 19, 2001, Ken Suain ("Suain"), a Rolls-Royce employee, was in the Plant 4 restroom when he heard Mr. Devore enter and speak to another employee who was about to exit the restroom.  Mr. Suain recognized Mr. Devore's voice because he and Mr. Devore worked together for years and had been card partners during work breaks.  Mr. Suain heard Mr. Devore enter a stall and shortly thereafter he heard sounds that he equated with masturbation.  Mr. Suain also heard Mr. Devore whispering and moaning "ooh baby, ooh baby."  Mr. Suain exited the restroom in a hurried fashion.  Before he left, however, Mr. Suain confirmed that there was no one in the restroom except for himself and Mr. Devore.

After Mr. Suain left the restroom, he and Mr. Knipp reported their encounters to Mr. Melton, who inspected the stall that Mr. Devore had used.  Mr. Melton claimed that he saw something running down the front of the commode.  He telephoned Mr. McLarnan to report the problem and to ask for direction.  Mr. McLarnan instructed Mr. Melton to tell Ms. Schunke to clean the stall in which Mr. Devore allegedly masturbated.  When Ms. Schunke cleaned the stall, which she had cleaned a few hours earlier, Ms. Schunke saw what she believed to be semen.  All of these events transpired within a few minutes from the time Mr. Suain heard the noises in the stall and when Ms. Schunke cleaned the area.

On November 26, 2001, Ms. Latham met with Mr. McLarnan, Mr. Hays, and Mr. Drake. During their meeting, the attendees noted that several Rolls-Royce employees named Mr. Devore as the person who was allegedly masturbating in the men's restroom.  Ms. Latham asked the Union to meet with Mr. Devore and request that he discontinue his practice.  The following day, the Union declined to resolve the matter with Mr. Devore.

-10-

On November 28, 2001, Mr. Knipp went to see Ms. Latham.  He told her about his and Mr. Suain's encounter with Mr. Devore and also identified other employees who had experienced similar encounters with Mr. Devore in the restroom.  Mr. Knipp said that one employee reported that he sat in semen, or some other type of lubricant.  Mr. Knipp also told Ms. Latham that the rumors about Mr. Devore's alleged actions began prior to Mr. Devore's transfer to Plant 4.  According to Mr. Knipp, when Mr. Devore was working in the machine shop in Plant 2, employees there also heard masturbation noises and identified Mr. Devore's shoes in the stall from which the noises were emanating.

During that November 28th meeting with Ms. Latham, Mr. Knipp said that what he believed to have transpired in the men's restroom gave him the "willies" and he asked whether the Company was going to do anything to stop the inappropriate conduct.  Later that same day, Ms. Latham spoke to Mr. Brookes, who informed Ms. Latham prior to November 28th that someone placed an anonymous call on the Company's ethics hotline, in which the unidentified individual claimed that someone was masturbating in the Plant 4 men's restroom.  Mr. Brookes had also previously disclosed to Mr. Latham that another employee came to him in confidence complaining about masturbation activity.  Mr. Brookes directed Ms. Latham to conduct an investigation.

On November 29, 2001, Ms. Latham met with Mr. Devore, Mr. Drake, Mr. Hays, and Mr. McLarnan.  Ms. Latham told Mr. Devore that his name had been identified in connection with the masturbation activity in the Plant 4 men's restroom, and that while she was not accusing him of this conduct, she was providing him with the opportunity to explain his involvement, if any, before she began conducting a formal investigation.  Mr. Devore did not respond.

-11-

Consequently, Ms. Latham proceeded with her investigation.

On December 3, 2001, Ms. Latham spoke with Ms. Schunke, Mr. Knipp, Mr. Suain, and Mr. Melton regarding their knowledge of the alleged masturbation activities in the men's restroom.  She also spoke with at least four other individuals Mr. Knipp had identified as having information regarding Mr. Devore's alleged masturbation in the men's restroom.  Ms. Latham reported the results of her investigation to Mr. Brookes and they decided that there was sufficient material evidence to support the Company's discipline of Mr. Devore for violation of Work Rule No. 22, indecent conduct.  Ms. Latham and Mr. Brookes also determined that even if Mr. Devore was not actually masturbating, he was mimicking masturbation, which they also deemed to be inappropriate and indecent behavior.

The next day, Mr. Brookes conducted a disciplinary/ethics hearing, which Mr. Devore, Mr. Drake, Mr. Hays, Ms. Latham, Mr. Brookes, and Mr. McLarnan attended.  Mr. Brookes briefly discussed Ms. Latham's investigation and findings, and then afforded Mr. Devore the opportunity to speak on his own behalf.  Mr. Devore denied that he had masturbated in the men's restroom and stated:  "It's not illegal to make noises in the men's restroom, is it?"

Under Work Rule No. 22, the Company may discipline employees in one of two ways: suspension or discipline.  After investigating all of the circumstances, Rolls-Royce decided to suspend Mr. Devore for 3.5 days without pay.

### B.  Procedural History

On the day of Plaintiff's suspension, and prior to his departure from Plant 4, the Union filed a grievance under the terms of the CBA on Plaintiff's behalf.  Plaintiff's grievance went through the

first three steps[3] of the grievance process and then proceeded to arbitration.[4]  On September 17,

2002, Arbitrator Duff conducted the arbitration.   On November 19, 2002, Arbitrator Duff issued an

opinion in which he denied Plaintiff's grievance.

On November 22, 2002, Plaintiff filed a complaint in the Court of Common Pleas of Knox

County, Ohio (the "Complaint"), in which he petitioned the court to modify and/or vacate Arbitrator

Duff's decision pursuant to OHIO REV. CODE § 2711.01.  In March 2003, the Defendants removed

Plaintiff's state case to this Court pursuant to 28 U.S.C. § 1441. Shortly thereafter, Defendant Rolls-

Royce and the Union Defendants moved to dismiss the Complaint on the grounds that Plaintiff failed

to state a claim upon which relief could be granted and that he lacked standing to appeal the

arbitration award.  On August 28, 2003, after obtaining leave of court, Plaintiff filed an amended

complaint (the "Amended Complaint").   In his Amended Complaint, Plaintiff asserted a hybrid

section 301 claim pursuant to the Labor Management Relations Act of 1947, 61 Stat. 156 (the

"LMRA"), (codified as amended at 29 U.S.C. § 185) and the Federal Arbitration Act (codified as

amended at 9 U.S.C. § 1 *et seq.*).  Specifically, Plaintiff alleged that the Union Defendants breached

---

[3]There is some discrepancy among the parties as to how many steps of the grievance process Plaintiff's grievance proceeded.  In his Memorandum in Opposition to Defendant Rolls-Royce's Motion, Plaintiff averred that his grievance went through the first and second steps of the process and then proceeded to arbitration.  Yet, the Union Defendants and Defendant Rolls-Royce state that Plaintiff's grievance went through the first three steps of the grievance process before proceeding to arbitration.

[4]In his Memorandum in Opposition to the Union Defendants' Motion, Plaintiff claims that, prior to completion of the arbitration process, he filed a National Labor Relations Board (the "NLRB") charge against DL 28 and LL 90.  Plaintiff also avers that he withdrew the NLRB charge prior to the time that Arbitrator Duff conducted the arbitration.  Plaintiff attached his NLRB charge form, dated September 11, 2002, as Exhibit J to his amended complaint.  At oral argument, which this Court conducted on April 20, 2005, the Union Defendants claimed that Plaintiff never filed an NLRB charge against the Union before arbitration, but that Plaintiff filed such a charge in December 2002 – a month after Arbitrator Duff issued his award.

their duty of fair representation to him in the arbitration, that Defendant Rolls-Royce breached the CBA, and consequently, Plaintiff avers that he has suffered harm. Plaintiff also alleged that Defendant Rolls-Royce defamed him and invaded his privacy. On September 12, 2003, Defendant Rolls-Royce filed its answer to the Amended Complaint. That same day, the Union Defendants also filed their answer to the Amended Complaint. On November 13, 2003, this Court denied the Defendants' Motions to Dismiss as moot.

On November 30, 2004, the Union Defendants filed their motion on the basis that summary judgment in their favor is proper because Plaintiff has failed to offer evidence sufficient to prove that the Union Defendants breached their duty of fair representation. Also, on November 30, 2004, Defendant Rolls-Royce filed its motion on the grounds that Plaintiff's hybrid section 301 claim fails because he cannot demonstrate that the Union Defendants breached their duty of fair representation and that Defendant Rolls-Royce breached the CBA. Defendant Rolls-Royce also argues that summary judgment in its favor is appropriate on Plaintiff's claims of defamation and invasion of privacy because Plaintiff has not established the elements of either claim.

On December 24, 2004, Plaintiff responded to Defendant Rolls-Royce's Motion, arguing, *inter alia*, that Defendant Rolls-Royce breached the anti-discrimination provision of the CBA because it allegedly discriminated against Plaintiff on the basis of his disability, and Defendant Rolls-Royce did not conduct the Plaintiff's grievance process in accordance with the CBA. Plaintiff also argued that summary judgment in favor of Defendant Rolls-Royce on Plaintiff's claims of defamation and invasion of privacy is inappropriate because Plaintiff adduces evidence that Defendant Rolls-Royce committed those torts. Thereafter, on December 27, 2004, Plaintiff responded to the Union Defendants' Motion, arguing, *inter alia*, that the Union Defendants breached

-14-

their duty of fair representation in several ways, Defendant Rolls-Royce breached the CBA, and therefore, summary judgment in favor of the Union Defendants is improper.

On January 7, 2005, the Union Defendants filed their reply, in which they maintained that they fully and fairly represented Plaintiff throughout his grievance process, and thus, the Court should grant their motion for summary judgment.  On January 10, 2005, Defendant Rolls-Royce filed its reply, in which it asserts that Plaintiff's claims fail as a matter of law because he does not establish that Defendant Rolls-Royce breached the CBA, that the Union Defendants breached their duty of fair representation, or that Defendant Rolls-Royce defamed him or invaded his privacy. Finally, on April 20, 2005, this Court heard oral arguments from the parties concerning the Defendants' motions for summary judgment.

### III.  STANDARD OF REVIEW

Summary judgment is appropriate "[i]f the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c). The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the non-moving party lacks evidence to support an essential element of its case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993).  In response, the non-moving party must then present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts."  *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993) (citations omitted).

In evaluating a motion for summary judgment, the evidence must be viewed in the light

-15-

most favorable to the non-moving party.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

The Court also must interpret all reasonable inferences in the non-movant's favor.  *United States*

*v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *see also Reeves v. Sanderson Plumbing Prods., Inc.*,

530 U.S. 133, 150 (2000) (stating that the court must draw all reasonable inferences in favor of

the non-moving party and must refrain from making credibility determinations or weighing the

evidence).  The existence of a mere scintilla of evidence in support of the non-moving party's

position will not be sufficient; however, there must be evidence from which the jury reasonably

could find for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986);

*Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995); *see also Matsushita Elec. Indus. Co. v.*

*Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (finding summary judgment appropriate when

"the record taken as a whole could not lead a rational trier of fact to find for the non-moving

party").

## IV.  ANALYSIS

### A.  The Nature of a Hybrid Section 301 Action

A hybrid section 301 action under the Labor Management Relations Act presents two

constituent claims:  (1) a claim of breach of collective bargaining agreement against an

employer; and (2) a claim against a union for breach of its duty of fair representation.[5]

---

[5]Section 301(a) of the LMRA provides:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this Act, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a).

*DelCostello v. International Brotherhood of Teamsters*, 462 U.S. 151, 164 (1983); *White v. Anchor Motor Freight, Inc.*, 899 F.2d 555, 559 (6th Cir. 1990). The claims in a hybrid section 301 action are interdependent.[6] *Hines v. Anchor Motor Freight*, 424 U.S. 554, 570-71 (1975). Therefore, "to prevail against either the company or the union, [the employee] must not only show that [his] discharge was contrary to the [collective bargaining] contract but must also carry the burden of demonstrating breach of duty by the union." *Id*.; *Perry v. Million Air*, 943 F.2d 616, 619 (6th Cir. 1991). Unless a plaintiff demonstrates both violations, he cannot succeed against either party. *Bagsby v. Lewis Bros. Inc. of Tennessee*, 820 F.2d 799, 801 (6th Cir. 1987); *see also Black v. Ryder/P.I.E. Nationwide, Inc.*, 930 F.2d 505, 510 (6th Cir. 1991) ("[W]hen the union cannot be held liable for unfair representation, of course, the employer cannot be held liable for breach of the collective bargaining agreement.") (citing *Hines*, 424 U.S. at 570-72); *cf. White*, 899 F.2d at 559-60 ("[I]f the first claim anchored in the employer's alleged breach of duty of the collective bargaining agreement fails, then the breach of duty of fair representation claim against the union must necessarily fail with it.").

### B. Duty of Fair Representation

Where, as in the case sub judice, after final arbitration has been conducted, resulting in a favorable award for the employer, an employee seeking recovery from a union based upon the union's breach of its duty of fair representation is "in reality seeking to vacate the arbitration decision." *Bruno v. United Steelworkers of America*, 784 F. Supp. 1286, 1304 (N.D. Ohio

---

[6]An employer's alleged breach of the collective bargaining agreement is premised on a violation of Section 301 of the LMRA, whereas a union's alleged breach of the duty of fair representation is "implicitly" premised upon the National Labor Relations Act. *Bruno v. United Steelworkers of America*, 784 F. Supp. 1286, 1302 (N.D. Ohio 1992).

1992).  Essentially, Plaintiff claims that the Union Defendants' breach of their duty of fair representation "seriously undermine[d] the integrity of the arbitral process," and therefore, "the bar of finality" of Arbitrator Duff's decision is removed.  *Hines*, 424 U.S. at 567.  Under these circumstances, Plaintiff must (1) establish that the Union Defendants breached their duty of fair representation, (2) demonstrate that there is "substantial reason" to believe that the Union Defendants' breach of their duty of fair representation "contributed" to (3) an erroneous arbitration decision.  *Bruno*, 784 F. Supp. at 1305 (interpreting *Wood v. International Brotherhood of Teamsters*, 807 F.2d 493, 500 (6th Cir. 1986) and *White*, 899 F.2d at 560 and outlining a three-part inquiry).

Under *White*, a threshold matter that a court must consider, in a hybrid section 301 action of this nature, is whether the arbitration decision is "erroneous."  *Id*.  A federal court has jurisdiction to review an arbitrator's decision when an allegation that the arbitrator reached an erroneous decision exists, yet the merits of such a decision are not subject to court review "even when the basis for the decision is ambiguous, *as long as the award draws its essence from the bargaining agreement*."  *White*, 899 F.2d at 560 (citing *Wood*, 807 F.2d at 500) (emphasis added).  An arbitration award does not draw its essence from a collective bargaining agreement when:  "(1) it conflicts with express terms of the agreement; (2) it imposes additional requirements not expressly provided for in the agreement; (3) it is not rationally supported by or derived from the agreement; or (4) it is based on 'general considerations of fairness and equity' instead of the exact terms of the agreement."  *Dallas & Mavis Forwarding Co., Inc. v. Gen. Drivers, Warehousemen & Helpers, Local Union No*. 89, 972 F.2d 129, 134 (6th Cir. 1992) (quoting *Cement Divs. v. United Steelworkers of America*, 793 F.2d 759, 766 (6th Cir. 1986)).

-18-

If a court does not find that an erroneous arbitral decision exists, then the query of whether the union breached its duty of fair representation becomes "immaterial, and is not justiciable." *White*, 899 F.2d at 560.  Thus, if Plaintiff does not establish that Arbitrator Duff rendered an "erroneous" decision, then his hybrid section 301 action against the Union Defendants fails as a matter of law.[7]  *Bruno*, 784 F. Supp. at 1305 (citing *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29 (1987)).

If Plaintiff establishes that Arbitrator Duff's decision is erroneous, then he must also demonstrate that the Union Defendants breached their duty of fair representation.  In order to substantiate his claim that the Union Defendants breached their duty of fair representation, Plaintiff must offer evidence sufficient for a reasonable trier of fact to conclude that the Union Defendants' conduct was "arbitrary, discriminatory, *or* in bad faith." *Vaca v. Sipes*, 386 U.S. 171, 190 (1967) (emphasis added); *Air Line Pilots Ass'n Int'l v. O'Neill*, 499 U.S. 65, 78 (1991). Under this "tripartite" standard, a plaintiff "need only show that the union's actions could be characterized in any one of these three ways." *Black v. Ryder/P.I.E. Nationwide, Inc.*, 15 F.3d 573, 584 (6th Cir. 1994).  In this Circuit, duty of fair representation claims are further limited to a question of whether a union singles an individual or a group out for treatment different from

---

[7]In *Bruno*, the court acknowledged that Sixth Circuit authority permits a plaintiff to file a hybrid section 301 suit in which he seeks to vacate an arbitrator's decision as one of several "alternative" means to vacate an arbitrator's decision. *Bruno*, 784 F. Supp. at 1305.  Other means of vacating an arbitrator's decision include, an employee's challenge of an arbitration decision that is "tainted" by a union's breach of its duty of fair representation; a suit to vacate an arbitration award on the grounds that the arbitrator possessed a "demonstrated bias"; or an action to vacate an arbitrator's award because it is premised on a violation of "well-defined" public policy. *Apperson v. Fleet Carrier Corp.*, 879 F.2d 1344, 1353 (6th Cir. 1999) (citations omitted); *Bruno*, 784 F. Supp. at 1306.  "[U]nlike where the employee's suit amounts to nothing more than an attempt to appeal the award on the merits, '[t]he federal courts need not defer to such arbitration awards.'" *Bruno*, 784 F. Supp. at 1306 (citing *Apperson*, 879 F. 2d at 1353).

-19-

another individual or group, in a manner that is "arbitrary, discriminatory, or in bad faith." *NLRB v. Local 299, International Brotherhood of Teamsters*, 782 F.2d 46, 51-52 (6th Cir. 1986). Moreover, to withstand summary judgment, a plaintiff may not characterize a union's alleged breach of the duty of fair representation in conclusory terms. *Painter v. Mazda Motor Mfg*. (USA) Corp., No. 92-1516, 1993 U.S. App. LEXIS 13472, at *12 (6th Cir. May 27, 1993). He must establish by "substantial evidence that the union acted arbitrarily, discriminatorily, or with bad faith." *Id*. (citing *Ratkosky v. United Transp. Union*, 843 F.2d 869 (6th Cir. 1988)).

Finally, Plaintiff must demonstrate that he was harmed by the Union's actions. *Garcia v. Zenith Elecs. Corp*., 58 F.3d 1171, 1176 (7th Cir. 1995). Indeed, Plaintiff must show that the outcome of this arbitration would have been different but for the Union Defendants' activities. *Id*. (citing *Black*, 15 F.3d at 585) (citation omitted).

### 1.  Whether Arbitrator Duff's Decision is Erroneous

In his Memorandum in Opposition to the Union Defendants' Motion, Plaintiff attacks the validity of Arbitrator Duff's decision on two bases.  First, he asserts that this Court should overrule Arbitrator Duff's decision because it is contrary to public policy.  Second, Plaintiff claims that Arbitrator Duff's decision should be vacated because it does not draw its essence from the CBA.  The Court will consider each argument in turn.

When a party challenges an arbitral decision on public policy grounds, a court "must determine whether the arbitrator's interpretation of the contract jeopardizes a well-defined and dominant public policy, taking the facts as found by the arbitrator." *USPS v. Nat'l Assoc. of Letter Carriers*, 330 F.3d 747, 751 (6th Cir. 2003) (quoting *Bd. of County Comm'rs v. L. Robert Kimball & Assocs*., 860 F.2d 683, 686 (6th Cir. 1988)).  Public policy is not derived from

"general considerations of public interest," but it must be determined from "laws and legal precedents." *Id*. In his discussion of the Union Defendants' alleged breach of their duty of fair representation, Plaintiff does not identify any specific public policy to which Arbitrator Duff's decision is contrary, and the Court cannot discern one. Accordingly, the Court finds that in his Memorandum in Opposition to the Union Defendants' Motion, Plaintiff has failed to present evidence sufficient for a reasonable trier of fact to conclude that Arbitrator Duff's decision should be vacated because it is contrary to public policy.

Next, Plaintiff argues that Arbitrator Duff's decision should be vacated because it deviates from the CBA. He claims that in Mr. McLarnan's experience, Defendant Rolls-Royce has never denied a grievance that was based on hearsay. Plaintiff also challenges Ms. Schunke's identification of human semen by sight, and the auditory "evidence" of his alleged masturbation, stating that it is "virtually impossible" for someone to identify human semen by sight and similarly, masturbation cannot be identified by sound. (Pl.'s Mem. Opp'n Union Defs.' Mot. Summ. J. at 14). Finally, Plaintiff contends that the charge against him was never amended to "mimicking" masturbation. (Pl.'s Mem. Opp'n Union Defs.' Mot. Summ. J. at 14).

The Union Defendants respond that Plaintiff's arguments regarding Defendant Rolls-Royce's reliance on hearsay and non-eyewitness information, and the fact that the substance that Ms. Schunke found was never positively identified as human semen, are precisely the arguments that LL 90 made on behalf of Plaintiff to Arbitrator Duff. The Union Defendants claim, however, that the fact that Arbitrator Duff rejected these arguments does not constitute evidence of the Union Defendants' breach of their duty of fair representation.

As set forth above, in order to persuade this Court to vacate Arbitrator Duff's decision

because it does not "draw its essence" from the CBA, Plaintiff must proffer evidence adequate to show that the arbitral decision falls within one of the following categories:  (1) it conflicts with the express terms of the CBA; (2) it imposes additional requirements not expressly provided for in the CBA; (3) it is not rationally supported by or derived from the CBA; or (4) it is based on "general considerations of fairness and equity" rather than the exact terms of the CBA.  *Dallas*, 972 F.2d at 134 (quoting *Cement Divs.*, 793 F.2d at 766).  Plaintiff neither argues that Arbitrator Duff's decision conflicts with the express terms of the CBA nor that the arbitrator imposes additional requirements not expressly provided for in the CBA.  Instead, he argues that Arbitrator Duff's decision is not rationally supported by or derived from the CBA and that it is based on "general considerations of fairness and equity." *Id*.

Although Plaintiff claims that there is no justification for Arbitrator Duff's decision and that it is a complete deviation from the CBA, he fails to demonstrate how the arbitrator's decision is not rationally supported by or derived from the CBA.  Plaintiff asserts that Arbitrator Duff permitted the "charge" against him to be "amended constructively" to mimicking sounds of masturbation, nevertheless he does not point to any section of the CBA that Arbitrator Duff violated when he determined that there was circumstantial evidence adequate to establish that Plaintiff either masturbated or mimicked masturbation, and that such conduct was punishable under Work Rule No. 22.[8]  (Pl.'s Mem. Opp'n Union Defs.' Mot. Summ. J. at 14).  Also, Plaintiff does not offer evidence sufficient to establish that Arbitrator Duff's reliance on hearsay

---

[8]At oral argument, in response to Plaintiff's contention that Arbitrator Duff amended the charge against him to "mimicking masturbation," which is conduct that is not expressly prohibited under Work Rule No. 22, Defendant Rolls-Royce argued that in his deposition testimony, Plaintiff conceded that "indecent conduct" under Work Rule No. 22, includes masturbation and mimicking masturbation.  (Oral Argument Tr. of 4/20/05 at 28, 32).

as opposed to eyewitness accounts of Plaintiff's alleged sexual misconduct is not rationally

supported by or derived from the CBA.[9]  Finally, Plaintiff states that Arbitrator Duff created "his

own common law" and used a form of fairness or equity to justify the same, but this conclusory

allegation is unsubstantiated.  (Pl.'s Mem. Opp'n Union Defs.' Mot. Summ. J. at 14-15).

Therefore, because Plaintiff has failed to offer evidence adequate to establish that Arbitrator

Duff rendered an erroneous decision, his claim that the Union Defendants breached the CBA is

not justiciable.

<u>2.  Plaintiff's and the Union Defendants' Arguments With Respect to Whether the Union
Defendants Breached their Duty of Fair Representation</u>

Even assuming *arguendo* that Arbitrator Duff rendered an erroneous decision, Plaintiff

cannot meet his burden of establishing that the Union Defendants breached their duty of fair

representation.[10]  The Union Defendants argue that summary judgment in their favor is proper

because:  (1) no court has determined that an employee is entitled to have independent counsel

represent him in arbitration proceedings and LL 90 has always utilized a business representative,

not an attorney, to represent an employee in arbitration proceedings; (2) under the CBA, an

_____

[9] The Court notes that Plaintiff has not identified any provision of the CBA that expressly
precludes an arbitrator from relying on hearsay evidence.  *See United Paperworkers Int'l Union
v. Misco, Inc.*, 484 U.S. 29, 39 (1987) (discussing the parties' ability to create procedural rules
for arbitrators to abide by as defined under the collective bargaining agreement, and determining
that the agreement expressly forbade an arbitrator from considering hearsay evidence).

[10] For purposes of this section, the Court will not consider whether the Union Defendants
conducted the grievance procedure in an arbitrary manner because it adopts Magistrate Judge
Abel's finding in his August 28, 2003 Order that Plaintiff has failed to plead sufficiently that the
Union Defendants' actions were arbitrary.  *See* Magistrate Judge Abel's Order, dated August 28,
2003 at 9.  The Court further finds that although, in his Amended Complaint, Plaintiff states a
number of times that the Union Defendants handled his grievance in an "arbitrary" manner, he
does not offer facts sufficient to support his allegation.

-23-

arbitrator's decision is final and binding, and other courts have held that a union does not breach its duty of fair representation if it does not petition a court to vacate an arbitrator's award; and (3) the Union Defendants "continuously and vigorously" defended Plaintiff during each step of the grievance process.  (Union Defs.' Mem. Supp. Summ. J. at 9-14).  Finally, the Union Defendants contend that because IAM International was neither a signatory to the CBA nor played any role in processing the grievance, IAM International did not owe a duty of fair representation to Plaintiff.     Plaintiff, responds that there are two "factors" that support the Union Defendants' alleged breach of their duty of fair representation.  (Pl.'s Mem. Opp'n Union Defendants' Mot. Summ. J. at 6).  First, Plaintiff states that unbeknownst to him at the time, the Union Defendants attended a meeting with Defendant Rolls-Royce's management on or about November 27, 2001 to discuss the alleged masturbation activities in the men's restroom of Plant 4.  (Pl.'s Mem. Opp'n Union Defendants' Mot. Summ. J. at 6).  In that meeting, Plaintiff argues that DL 28 and LL 90 refused to "intercede" on his behalf and the Union Defendants failed to inform him that he had been implicated in a serious matter before he met with Union representatives and Defendant Rolls-Royce management employees on or about November 29, 2001.  (Pl.'s Mem. Opp'n Union Defendants' Mot. Summ. J. at 6).  Additionally, Plaintiff argues that his Union representatives' failure to investigate the masturbation allegations against him resulted in his 3.5 day suspension from work.  Specifically, Plaintiff contends that his Union representatives failed to clarify how Defendant Rolls-Royce could discipline Plaintiff before it charged him with a Work Rule No. 22 violation.  Second, Plaintiff avers that the Union Defendants acted in bad faith.  Plaintiff claims that the Union Defendants were "tainted against" him because Plaintiff had filed an NLRB charge against the LL 90 prior to the arbitration.  (Pl.'s

Mem. Opp'n Union Defendants' Mot. Summ. J. at 9-10).  According to Plaintiff, because the

Union was hostile toward him, they processed his grievance in a perfunctory manner.[11]

In their Reply Memorandum, the Union Defendants assert that it is true that a

representative of Defendant Rolls-Royce asked either Mr. Drake or Mr. Hays

 approach Plaintiff regarding the masturbation accusations and that the Union representative(s)

declined to broach the matter to him.  The Union Defendants claim, however, that contrary to

Plaintiff's statement that the Union was obligated to assist Defendant Rolls-Royce with its

investigation of the sexual misconduct complaints, this is a matter that is within the province of

the employer, Defendant Rolls-Royce, and therefore, the Union Defendants were not required to

assist Defendant Rolls-Royce in its investigation.  Also, the Union Defendants argue that

Plaintiff does not proffer evidence sufficient to establish that the Union representatives' failure

to assist Defendant Rolls-Royce in its investigation resulted in his suspension.

3.  Whether Plaintiff Offers Evidence Sufficient to Establish that the Union Defendants' Conduct
was Discriminatory or in Bad Faith

Plaintiff does not offer evidence sufficient for a trier of fact to conclude that genuine

issues of material fact exist with respect to the Union Defendants'[12] alleged breach of the duty of

fair representation.  First, although Plaintiff does not so expressly state, it appears that he

---

[11]Plaintiff does not further address (1) whether the Union Defendants breached their duty
when they denied Plaintiff's request to have his own attorney conduct the arbitration; (2)
whether LL 90's decision not to appeal the adverse decision of Arbitrator Duff constitutes a
breach of duty of fair representation; or (3) whether IAM International owes a duty of fair
representation to him.

[12]For purposes of this section, the "Union Defendants" refers solely to DL 28 and LL 90
because the Court finds that IAM International did not owe the Plaintiff a duty of fair
representation at all relevant times.  *See infra* Part IV.B.4.

predicates his failure to investigate claim against the Union on an arbitrariness theory.  Because

the Court adopts Magistrate Judge Abel's finding that Plaintiff fails to plead adequately

arbitrariness in his Amended Complaint, the Court declines to decide whether the Union

Defendants breached their duty of fair representation by behaving in an arbitrary manner.  *See*

*supra* note 10.

Second, in order to substantiate his claim that the Union Defendants discriminated

against him, Plaintiff must show that the Union Defendants' processing of his grievance was

"motivated by class-based discriminatory animus."  *Bruno*, 784 F. Supp. at 1310.  Plaintiff's

deposition testimony wholly undermines any purported discrimination claim against the Union

Defendants.  Significantly, when asked if the Union treated him differently from any other Union

member, Plaintiff stated:  "I couldn't really say on that because the comparison things – I

couldn't say.  I don't know."  (Pl.'s Dep. at 200).  This is not a statement from which

discrimination of any form may be inferred.

At oral argument, Plaintiff conceded that he was not asserting a claim of disability

discrimination against the Union Defendants pursuant to the Americans with Disabilities Act of

1990, 104 Stat. 328 (codified as amended at 42 U.S.C. § 12101 *et seq*.).  Nevertheless, Plaintiff

argued that the Union Defendants conducted the grievance process in a "perfunctory" manner

because he possesses a "physical disability."  (Oral Argument Tr. of 4/20/05 at 20).  The record,

however, is completely devoid of a single instance in which the Union Defendants refused to

devote adequate preparation or attention to Plaintiff's grievance process because of his alleged

physical disability.

Additionally, at oral argument, Plaintiff claimed that the Union Defendants discriminated

against him because he was the sole individual investigated by Defendant Rolls-Royce and the

Union Defendants as the alleged masturbation perpetrator.  Yet, Plaintiff has not established that

the Union Defendants were under any obligation to suggest other potential perpetrators to

Defendant Rolls-Royce.  Plaintiff further argues that he was the only individual investigated

because he had a "repulsive appearance," and thus, the Company and the Union Defendants

assumed that he was the perpetrator.  (Oral Argument Tr. of 4/20/05 at 23).  Yet, nothing in the

record suggests that the Union Defendants assumed that Plaintiff was the masturbation

perpetrator by virtue of his "repulsive appearance."  Therefore, even when viewing the evidence

in the light most favorable to the Plaintiff, he simply fails to support his discrimination claims

against the Union Defendants.

Finally, in order to succeed on a claim that a union acted in "bad faith," the plaintiff is

required to demonstrate that a union representative's actions were motivated by "ill will" or

some type of "dishonest purpose."  *Bruno*, 784 F. Supp. at 1310.  Plaintiff claims that the Union

Defendants possessed an alleged bias against him, that the Union representatives conducted the

arbitral process in a perfunctory manner, and that this behavior gives rise to a claim of bad faith.

To support this assertion, Plaintiff states that he filed an NLRB charge against the Union before

the arbitration, and that he had previously filed suit against the Union.  Yet, in his deposition,

Plaintiff stated that neither Mr. Drake nor Mr. Hays exhibited "ill-will" towards him.  (Pl.'s Dep.

at 200-01).  Plaintiff also could not identify a single instance where he had a "run-in" with DBR

Rayburn.  (Pl.'s Dep. at 201-02). Furthermore, he does not present evidence sufficient to

establish that any Union representative behaved in a manner motivated by a "dishonest purpose."

Thus, Plaintiff's filing of his NLRB charge against the Union Defendants, and the fact that he

previously filed suit against the Union, without more, are insufficient to establish that the Union Defendants acted in bad faith.[13]

<u>4.  IAM International Did Not Owe a Duty of Fair Representation to Plaintiff</u>

In *Lawrence v. Teamsters*, No. 3:98CV7047, 2001 WL 243532, at *6 (N.D. Ohio Mar. 12, 2001), the court determined that a plaintiff may only bring a hybrid section 301 claim against parties that are signatories to the collective bargaining agreement.  *Id*. (citing *Teamsters Local 30 v. Helms Express, Inc*., 591 F.2d 211, 217 (3d Cir. 1979)).  Moreover, the duty of fair representation will not extend to an entity that is not the plaintiff's exclusive bargaining representative.  *Id*.  The Court finds that because IAM International is not a signatory to the CBA and Plaintiff has not rebutted the Union Defendants' assertion that IAM International did not participate in the processing of Plaintiff's grievance, IAM International did not owe a duty of fair representation to Plaintiff.

Based on the foregoing, the Union Defendants' Motion is **GRANTED** in its entirety.

**C.  Whether Defendant Rolls-Royce Breached the CBA**

Because this Court holds that the Union Defendants did not breach their duty of fair representation, Plaintiff's hybrid section 301 action fails as a matter of law, and hence it is unnecessary to determine whether Defendant Rolls-Royce breached the CBA.  *See Black  v. Ryder/P.I.E. Nationwide, Inc*., 930 F.2d 505, 510 (6th Cir. 1991) ("[W]hen the union cannot be held liable for unfair representation, of course, the employer cannot be held liable for breach of

---

[13]Because the Court holds that the Union Defendants did not breach their duty of fair representation, it need not consider whether there is "substantial reason" to believe that the Union Defendants' breach of the duty of fair representation "contributed" to an erroneous arbitration decision.  *Bruno v. United Steelworkers of America*, 784 F. Supp. 1286, 1305 (N.D. Ohio 1992).

the collective bargaining agreement.") (citing *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 570-72 (1976)).

### D.  Whether Defendant Rolls-Royce Defamed Plaintiff

Next, Defendant Rolls-Royce argues that Plaintiff's defamation claim is time-barred under Ohio law, but even if this Court deems Plaintiff's claim to be timely, Plaintiff's defamation claim still fails as a matter of law.  Plaintiff responds that Defendant Rolls-Royce is liable for slander and/or libel, and that the Company has caused his reputation to be lowered in his small-town community.  Plaintiff does not address Defendant Rolls-Royce's argument that his defamation claim is time-barred.  As set forth below, because this Court finds that Plaintiff fails to satisfy the elements of a defamation claim under Ohio law, this Court need not reach the statute of limitations issue.

Under Ohio law, the prima facie case of defamation for a private figure consists of five elements:  "(1) a false and defamatory statement; (2) about the plaintiff; (3) published without privilege to a third party; (4) with fault of at least negligence on the part of the defendant; *and* (5) that was either defamatory per se . . . or caused special harm to the plaintiff."  *Abrams v. Millikin & Fitton Law Firm*, 267 F. Supp. 2d 868, 877 (S.D. Ohio 2003) (emphasis added) (citation omitted).

As a threshold consideration, under the Ohio defamation test, Plaintiff has the burden of demonstrating that Defendant Rolls-Royce published a false and defamatory statement concerning him.  *Id*.  Plaintiff claims that Defendant Rolls-Royce defamed him on December 4, 2001, when it "published" that the Company had found him guilty of inappropriate sexual conduct.  Plaintiff's defamation claim fails as a matter of law because, although he argues that

-29-

Defendant Rolls-Royce wrongfully published that he had been charged and sanctioned for inappropriate sexual conduct, Plaintiff offers no evidence of Defendant Rolls-Royce's false and defamatory statement. Plaintiff's bald assertion that Defendant Rolls-Royce never pursued the truth, and the fact that the Company never obtained eyewitness accounts of his alleged masturbation, is insufficient to establish falsity. Additionally, Plaintiff fails to adduce sufficient evidence – by pleading or otherwise – that Defendant Rolls-Royce's finding that he violated Work Rule No. 22, and the corresponding suspension that the Company imposed upon Plaintiff, constitutes a defamatory statement. Because the test for defamation under Ohio law is in the conjunctive, and the Court finds that Plaintiff has failed to satisfy element one – a false and defamatory statement – the Court determines that Plaintiff's defamation claim fails as a matter of law.

Based upon the foregoing, Defendant Rolls-Royce's Motion with respect to Plaintiff's defamation claim, is **GRANTED**.

### E.  Whether Defendant Rolls-Royce Invaded Plaintiff's Privacy

Finally, Defendant Rolls-Royce argues that Plaintiff cannot demonstrate that the Company invaded his privacy, and hence summary judgment in its favor on this claim is appropriate. Plaintiff responds that Ohio courts protect the privacy of an employee in the workplace if a reasonable expectation of privacy exists. Plaintiff further asserts that he had a reasonable expectation of privacy, which Defendant Rolls-Royce violated when it permitted "fellow employees to pray [sic] upon [him and] to subject him to ridicule and even to follow him and stand outside of his lavatory stall to ascertain the sound that he made in the elimination of his waste." (Pl.'s Mem. Opp'n Rolls-Royce's Mem. Supp. Summ. J. at 16).

Under Ohio law, the tort of invasion of privacy includes any of the following: "(1) intrusion upon the plaintiff's seclusion or solitude, or into his private affairs; (2) public disclosure of embarrassing private facts about the plaintiff; (3) publicity which places the plaintiff in a false light in the public eye; and (4) appropriation, for the defendant's advantage, of the plaintiff's name or likeness." *Hamrick v. Wellman Prods. Grp.*, No. 03CA0146-M, 2004 WL 2243168, at *7 (Ohio Ct. App. Sept. 29, 2004).

In this case, the crux of Plaintiff's invasion of privacy claim, at least as framed in his Memorandum in Opposition to Defendant Rolls-Royce's Motion, is that Defendant Rolls-Royce allowed Plaintiff's fellow coworkers to monitor and engage in surveillance of his restroom routine, and that this violated his reasonable expectation of privacy. Defendant Rolls-Royce asserts, however, that it did not request that anyone monitor Plaintiff's restroom activities, and Plaintiff admits that he lacks evidence that the Company encouraged anyone to investigate him in the Plant 4 men's restroom. (Def. Rolls-Royce's Reply Mem. at 10 (citing Pl.'s Dep. at 281)). Assuming *arguendo* that Plaintiff had a reasonable expectation of privacy while he was in the men's restroom, Plaintiff has failed to offer evidence to support his claim that Defendant Rolls-Royce invaded his privacy by authorizing its employees to spy on his restroom activities. Consequently, there are no genuine issues as to any material facts with respect to Plaintiff's invasion of privacy claim.

Based upon the foregoing, Defendant Rolls-Royce's Motion with regard to Plaintiff's invasion of privacy claim, is **GRANTED**.

## V.  CONCLUSION

For reasons set forth above, the Union Defendants' Motion [Docket No. 37] is

**GRANTED** in all respects.  Defendant Rolls-Royce's Motion [Docket No. 36] is **GRANTED** in

all respects.  This case is dismissed.

**IT IS SO ORDERED.**

       _s/ Algenon L. Marbley_____
**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**


**DATED:  June 15, 2005**